UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SCOTT GREMILLION, on behalf of himself and other persons similarly-situated | * | CIVIL ACTION |
| | * | NO. 2:16-cv-09849 |
| VERSUS | | |
| | * | SECTION I (JUDGE AFRICK) |
| COX COMMUNICATIONS LOUISIANA, LLC and GRAYCO COMMUNICATIONS, L.P., | * | MAG.  (JUDGE van MEERVELD) |

**DEFENDANT COX COMMUNICATIONS LOUISIANA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to L.R. 7.4, Defendant Cox Communications Louisiana, LLC ("**Cox**"), respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The sole issue before the Court is whether Cox *jointly* employed Plaintiff Scott Gremillion ("**Plaintiff**"), a former cable installation technician who worked for Grayco Communications, L.P. ("**Grayco**") for less than ***four months***. Viewed in the light most favorable to Plaintiff, the undisputed facts unequivocally demonstrate that Cox was <u>not</u> a joint employer under either the Fair Labor Standards Act ("**FLSA**") or Louisiana law.

As an initial matter, to the extent that Plaintiff was an *independent contractor* for Grayco (as reflected in Plaintiffs' tax returns and in his contract with Grayco), he cannot be an *employee* of Cox. But even if Plaintiff could establish that he was an employee of Grayco, he still fails to establish that Cox was his joint employer as a matter of economic reality. Contrary to Plaintiff's allegations, Grayco was not economically dependent upon Cox or a mere "puppet" for Cox. The record is clear that Grayco and Cox do not share ownership, management, facilities, or capital. Rather, Grayco is an independent, thriving company with multiple offices in Texas and Louisiana. Significantly, Grayco derives at least two-thirds of its revenue from sources <u>other</u> than Cox. Because Grayco is independent of Cox, Plaintiff cannot meet the four-factor economic realities test used by the Fifth Circuit to evaluate joint employment.

First, Plaintiff admitted that Cox played no role in hiring him. Rather, Plaintiff obtained an application from Grayco and submitted it only to Grayco. He did not complete or submit an application to Cox. He interviewed with a Grayco supervisor and did not speak to anyone from Cox. Grayco told Plaintiff that he had the job. Plaintiff entered into a contractor agreement with Grayco, not Cox. Similarly, Plaintiff testified that when he resigned, he told Grayco, not Cox.

Second, Plaintiff testified that no one from Cox ever discussed pay with him and Cox did not issue him a single paycheck. Rather, Grayco issued paychecks to Plaintiff, set his pay rate, and issued him a 1099. Cox's payments to Grayco pursuant to a master services agreement have no logical or legal connection to how Grayco independently decided to pay Plaintiff.

Third, Plaintiff testified that he was not supervised by anyone at Cox and, in fact, <u>he could not name a single Cox manager or employee</u>. He did not report to work at Cox's facilities, nor did he speak to anyone from Cox before he began work for the day. Rather, he reported to Grayco's office every morning and checked in with his Grayco supervisors, who provided him with his schedule each day. Cox had no input into which days of the week Plaintiff worked. Grayco, not Cox, decided which work orders Plaintiff would be assigned. If Plaintiff wanted a day off, he advised Grayco, not Cox. If Plaintiff had an issue at a job, he called Grayco, not Cox. Cox did not provide Plaintiff with any tools to perform his job. Rather, Plaintiff testified that he used his own vehicle and his own tools (so many of them he could not count them all).

Fourth, Cox did not maintain employment records for Plaintiff. It only keeps records related to Plaintiff's identification badge, which was for the purpose of protecting the safety of Cox's customers.

Every court, with just one exception, that has decided this issue at the summary judgment stage has found that cable companies are not joint employers with the installation companies they contract with.[1] Indeed, in *Valdez v. Cox Communications Las Vegas, Inc.*, a case with nearly identical facts, the court held that Cox did not jointly employ its contractor's technicians. No. 2:09-cv-01797-PMP-RJJ, 2012 WL 1203726 (D. Nev. April 11, 2012). There is no material difference between this case and *Valdez*, or the numerous other cases finding that cable companies are not joint employers of their vendors' technicians. Accordingly, Cox respectfully requests that this Court reach the same result by granting summary judgment and dismissing Cox from this action.

---

[1] *Perez v. Lantern Light Corp.*, No. C12-01406 RSM, 2015 WL 3451268 (W.D. Wash. May 29, 2015) is the <u>only</u> exception to the otherwise uniform rulings in favor of cable companies on the joint employment issue. In *Lantern Light*, the facts were unique because, for example, the technicians were required to work only for DirecTV and DirecTV assigned work schedules to the individual technicians, tracked individual technician skill sets, monitored individual technician performance, approved or denied time off requests, and disciplined technicians. *Id.* <u>None</u> of these facts is present here. Plaintiff's assertion that *Lang v. DirecTV*, 801 F. Supp. 2d 532 (E.D. La. 2011), found against the cable company on the joint employment issue misunderstands that case. *Lang* was an independent contractor case, <u>not</u> a joint employment case. Recognizing this distinction, Judge Vance expressly stated that she was <u>assuming joint employment</u> for purposes of summary judgment because the <u>only</u> argument presented by DirecTV was whether the technician was an independent contractor or not. *Id.* at 536.

2

## SUMMARY OF RELEVANT UNDISPUTED FACTS

### I.   COX'S BUSINESS

Cox provides cable, telephone, Internet and communication services to residences and businesses (Cox's "customers") in the State of Louisiana and throughout parts of the United States.[2] These customers buy services and cable equipment from Cox in order to have access to television, internet, and/or telephone services in their homes or offices. (Peeples Decl. ¶ 4). The equipment must be properly installed for safety and legal reasons. (*Id.* ¶ 6). Cox contracts with several independently owned and operated third-party cable installation companies to provide installation and maintenance services to Cox's customers. (*Id.* ¶ 8).

### II.   GRAYCO'S BUSINESS

As relevant to this action, the third-party cable installation company with whom Cox contracted was Grayco, which began providing contract services for Cox in July of 2014.[3] Cox and Grayco do not share office space or office buildings or warehouses. (Grambow Decl. ¶ 10). Cox's New Orleans office is at 338 Edwards Street in Harahan, Louisiana. (Peeples Decl. ¶3). Grayco's New Orleans operations are located at 2601 Lexington Ave., Suite A in Kenner, Louisiana. (Grambow Decl. ¶ 3). In fact, Grayco has multiple locations in Texas and in Louisiana, including locations in Houston, San Antonio, Baton Rouge, Lafayette, and New Orleans. (*Id*) Cox does not have an ownership interest in Grayco and does not supply or share managers or employees with Grayco. (*Id.* ¶ 7). Grayco has no ownership or financial interest in Cox. (*Id.* ¶ 8). Instead, Grayco is wholly owned by Barbara Gray (President/CEO) and operated by Butch Grambow (Vice President of Operations), neither of which work for Cox or have an ownership interest in Cox. (*Id.* ¶ 9). Nathan Williams is Grayco's Director of Operations for Grayco's Installation Division (Grayco has other divisions totally unaffiliated with Cox).[4] Within the installation division, Grayco employs managers and supervisory personnel to oversee

---

[2] *See*, Declaration of Joseph Peeples ["Peeples Decl."], attached as Exhibit A, ¶ 2.
[3] *See*, Deposition of Joseph Peeples, attached as Exhibit B, 26:24-25; Declaration of Butch Grambow ["Grambow Decl."], attached hereto as Exhibit C, ¶ 5).
[4] *See*, Deposition of Nathan Williams, attached as Exhibit D, 9:5-7; Grambow Decl. ¶ 11.

Grayco's installation technicians–these individuals are not employed by and do not work at Cox. (Grambow Decl. ¶ 12). None of these individuals reports to or supervises anyone employed by Cox. (*Id.*). Importantly, Cox is not Grayco's only customer; Grayco does business with several other companies that are unrelated to Cox. (*Id.* ¶¶ 13, 14). Indeed, only approximately one-third of Grayco's annual revenue is from Cox. (*Id.* ¶ 15).

## III.   COX'S CONTRACT WITH GRAYCO

Cox and Grayco entered into a Field Service Agreement ("FSA"), which sets forth the parties' agreement regarding Grayco's installation of cable, telephone, and internet services for Cox's customers.[5] (Peeples Decl. ¶ 9). The version of the FSA that was in force during Plaintiff's work for Grayco was executed on June 1, 2015. (*Id.*; Grambow Dep. 16:10-13). Pursuant to the FSA, Grayco is an "independent contractor" of Cox, and none of Grayco's technicians are employees of Cox. (Ex. E ¶ 9). Neither Grayco nor its technicians "is, nor shall become, Cox's employee or agent, and [the FSA] does not establish a partnership or joint venture between either [Grayco] and Cox or [Grayco's technicians] and Cox." (*Id.*).

When Cox's customers request installation or maintenance services, they contact Cox and select a two-hour window of time in which the installation service will take place. (Peeples Decl., ¶ 10). Each customer's request results in a work order being generated in Cox's automated billing system, ICOMs. (*Id.* ¶ 11). Cox's automated computer application, which is referred to as ETA Direct and which can be accessed from the CXConnect portal, generates bundles of work orders from ICOMs and sends them to Grayco based on the resources Grayco has available. (*Id.* ¶ 13). For example, if Grayco advises Cox that it has 15 technicians available on a given day, then the computer sends 15 bundles of work orders to Grayco. (*Id.* ¶ 14). Grayco's technician numbers serve as placeholders for the separate bundles of work orders. (Peeples Dep. 105:6-14). Each morning, Grayco assigns the individual work orders to its technicians as it sees fit, which may involve breaking apart the "bundles" sent by Cox. (Williams Dep. 56:14-25; 82:5-13;

---

[5] A true and correct copy of the FSA is attached hereto as Exhibit E; *see also* Deposition of Raymond "Butch" Grambow, attached as Exhibit F, 15:10-18.

Peeples Dep. 105:12-13). Grayco assigns the work orders to technicians based on each technician's work load and geographic location, to which Cox is not privy. (Williams Dep. 64:17-25).

To ensure that the cable and internet installation performed by Grayco is completed in a safe and proper manner, Cox conducts random quality control checks on a small percentage of completed work orders. (Peeples Decl. ¶ 16). Cox also requests that its customers complete surveys. (*Id.*) Cox discusses its quality control checks and customer surveys with the management of Grayco. *(Id.* ¶ 17). Cox did not ever discuss customer complaints, its surveys, or its quality control checks with Grayco's technicians, including Plaintiff. (*Id.* ¶ 18).

For safety reasons and to put customers at ease, Cox's FSA requires that Grayco's technicians wear badges that state "Authorized Vendor for Cox Communications" and that the technicians' vehicles have the same label. (*Id.* ¶ 27). In addition, Cox's contract with Grayco requires that Grayco's technicians pass a criminal background check and drug test before they can service Cox's customers so that Cox can ensure that its customers are safe and not subject to individuals who have committed crimes or use illegal drugs. (*Id.* ¶ 29).

Cox does not supply Grayco with any tools or supplies to perform the job, such as trucks, signs, uniforms, hammers, ladders, nails, drills, other basic tools. (Williams Dep. 67:6-11).[6] Cox only supplies to Grayco the equipment purchased and/or leased by Cox's customers, such as cable boxes, modems, and fittings. (Peeples Decl. ¶ 30; Williams Decl. ¶ 7).

Cox does not pay Grayco's technicians and has no control over how they are paid. (Peeples Decl. ¶ 19; Williams Dep. 109:15-17). Cox pays Grayco for its services on a point-based system pursuant to the FSA. (*Id.* ¶¶ 19, 20). The FSA requires that Grayco follow the law in paying its workers, but does not address how Grayco is to pay its technicians. (*Id.*, ¶ 20). It is entirely within Grayco's discretion to determine how to pay its technicians. (Williams Dep. 109:15-110:4; Williams Decl. ¶ 8). Plaintiff testified that he has no evidence as to whether Cox

---

[6] *See*, Declaration of Nathan Williams ["Williams Decl."], attached hereto as Exhibit G, ¶ 5.

has anything to do with his pay. (Pl. Dep. 280:16-282:13).

## IV.   <u>PLAINTIFF CONTRACTED DIRECTLY WITH GRAYCO – NOT COX</u>

Plaintiff signed a subcontractor agreement on November 2, 2015 and worked as a technician for Grayco for <u>less than four months</u>, from December 29, 2015 until April 22, 2016.[7] Plaintiff understood that he was a subcontractor of Grayco and not Cox. (*Id.*).

### A.   <u>Cox Did Not Hire Plaintiff</u>

Plaintiff completed an application and submitted it to Grayco on November 2, 2015 after seeing Grayco's trucks around town. (Pl. Dep. 80:24-81:4, 83:21-23). At this time, Plaintiff spoke with Grayco Supervisor, Deshan Williams. (*Id.*, 82:2-15). Plaintiff did not complete or submit an application to Cox, nor did he speak to anyone at Cox about a job. (*Id.*, 91:22-92:21).

Grayco processed a criminal background check and drug screen for Plaintiff. (Pl. Dep. 84:11-14; Williams Dep., 26:20-25). Pursuant to its contract with Cox, Grayco submitted the results to Cox so that Cox could verify that it was safe to allow Plaintiff into the homes of its customers. (Williams Dep., 28:18-21; Peeples Decl. ¶ 29). Cox then sent to Grayco a technician identification number, along with a badge identifying Plaintiff as an authorized vendor. (*Id.*, 155:19-20; Peeples Decl. ¶ 27; Williams Dep., 29:11-12). Grayco provided a shirt to Plaintiff that identified him as an "authorized vendor" of Cox and also had Grayco's name on it. (Pl. Dep., 173:17-25; Williams Decl. ¶ 8). The purpose of the identification number, badge, and shirt was for safety reasons – they allowed Cox's customers to verify that Plaintiff was authorized to install Cox equipment. (Peeples Dep., 42:16-18, 50:19-25; Peeples Decl. ¶¶ 27-28).

### B.   <u>Cox Did Not Determine Plaintiff's Compensation and Did Not Pay Him</u>

Plaintiff did not speak with anyone from Cox about his pay. (Pl. Dep. 130:24-131:1). Plaintiff testified that he has no evidence as to whether Cox had anything to do with his pay. (*Id.*, 280:16-282:13). Cox was not aware of, and had no involvement in, the amount Grayco paid its technicians or how that amount was calculated. (Peeples Dep. 185:16-20; Williams Dep. 109:6-

---

[7] Deposition of Scott Gremillion ["Pl. Dep."], attached as Exhibit H, 53:14-16; 83:14-16; 92:23-93:2; 247:19-20. A true and correct copy of the subcontractor agreement is attached as Exhibit I.

8). Cox did not issue Plaintiff a 1099 or W-2. (Pl. Dep. 130:20-22). Cox had no knowledge of how many hours Plaintiff worked. (Peeples Decl. ¶ 15). It was entirely within Grayco's discretion to determine how to pay its technicians. (Williams Dep. 109:15-110:4; Williams Decl. ¶ 9). Plaintiff spoke with Grayco's manager, Deshan Williams, about pay before he completed his application to work for Grayco. (Pl. Dep. 85:14-17). Specifically, Mr. Williams informed Plaintiff that Grayco had a "point system," whereby Grayco pays so many points for each job. (*Id.*, 86:6-12). Plaintiff did "homework" about working for Grayco by talking to other Grayco installers. (*Id.* at 87:1-9).

Plaintiff received his paychecks from Grayco, not Cox. (Pl. Dep. 182:6-12). Grayco, not Cox, issued Plaintiff a 1099, and Plaintiff will file his tax returns identifying Grayco, not Cox, as the source of his income. (*Id.*, 99:14-20, 130:20-22). Plaintiff signed a Wage Deduction Authorization form allowing Grayco to deduct from his paycheck. (*Id.*, 102:5-25).[8] Grayco, not Cox, deducted from Plaintiff's paychecks. (*Id.*, 133:18-134:6). Cox never deducted from Plaintiff's paycheck and, to Plaintiff's knowledge, never instructed Grayco to deduct from his paycheck. (*Id.*, 227:1-3; 133:22-25). Cox had no involvement or input whatsoever in how Grayco paid Plaintiff or the amount Grayco deducted from his paychecks. (Williams Dep. 109:15-110:4). Even when Cox issued charge backs to Grayco pursuant to the FSA for failed quality control checks, Grayco did not necessarily deduct that amount from its technicians, if it deducted from them at all. (Williams Dep. 50:1-7; Williams Decl. ¶ 10).

**C.    Cox Did Not Provide Plaintiff With Tools Required to Complete the Job**

Plaintiff used a hundred different tools, which he owned, that were worth "a good $2,000 at least", when he worked for Grayco, including a ladder, screw drivers, crimpers, strippers, meters, test equipment and cable caddies. (Pl. Dep. 49:20-50:21; 97:4-5). He purchased and paid for his own truck, gas, and maintenance. (*Id.,* 51:4-12). If Plaintiff did not have a specific tool that he needed to complete the job, he could obtain that tool <u>from Grayco</u>, the cost of which

---

[8] A true and correct copy of the Wage Deduction Authorization is attached hereto as Exhibit J.

Grayco deducted from his paycheck. (Williams Dep. 75:6-76:15). Grayco, not Cox, paid for Plaintiff's uniforms and deducted the cost from his paycheck. (Williams Decl., ¶ 8).

Cox did not provide Plaintiff with <u>any</u> tools. (Williams Dep. 67:6-11). Rather, Cox provided to Grayco (not Plaintiff) only the cable equipment (such as cable boxes and modems) that its customers had purchased or leased from Cox to be installed in their homes. (Williams Decl. ¶ 7). Grayco collected this equipment from Cox and stored it in Grayco's own warehouse. (Williams Decl., ¶ 7; Pl. Dep. 109:5-8). Plaintiff obtained the equipment he would be installing in customer's homes from Grayco's warehouse each morning. (Pl. Dep. 106:24-107:14).

### D.   Cox Did Control the Terms and Conditions of Plaintiff's Work

#### 1.   Cox Did Not Set Plaintiff's Work Schedule

Grayco, not Cox, determined the number of days and the specific days of the week Plaintiff was required to work. (Williams Decl. ¶ 11). Grayco, not Cox, assigned Plaintiff the specific work orders for each day he worked. (Williams Dep. 82:5-19; Williams Decl. ¶ 9).

Plaintiff reported to Grayco's office each morning. (Pl. Dep. 104:18-105:19). Plaintiff logged onto CXConnect to see what jobs he had for the day and to determine the equipment he needed from Grayco's warehouse. (*Id.*, 110:1-13). Plaintiff does not know who assigned the jobs on CXConnect and has no evidence that Cox ever assigned him work. (*Id.*, 112:25-113:21). After obtaining his work orders and the equipment from Grayco's warehouse (not Cox's warehouse), Plaintiff got in his truck and completed his jobs. (*Id.*, 114:5-12).[9] Plaintiff used the CXConnect program, along with Grayco's system (Penguin) to record that he had arrived within the customer's requested window and successfully completed each work order that Grayco had assigned to him. (*Id.*, 219:21-220:14).

#### 2.   Cox Did Not Supervise Plaintiff

Plaintiff admits that no one at Cox supervised him. (*Id.*, 120:4-5). Rather, Plaintiff testified that he was supervised by Grayco manager, Louis Hall. (*Id.,* 120:7-11). He spoke to Mr.

---

[9] A couple of times, Plaintiff went with a Grayco manager to Cox's warehouse to pick up Grayco's inventory of cable boxes and modems, but this was not part of his normal duties. (Pl. Dep. 144:16-145:19, 146:17-23).

Hall about five to six times per day, including in the morning when he checked in and whenever he had problems with an installation. (*Id.,* 118:22-25, 164:6-25). For example, Plaintiff called Mr. Hall if he had a problem with a tap or if a customer was not ready for cable to be installed. (*Id.*, 120:13-25). Plaintiff did not contact Cox when he had these issues. (*Id.*, 121:20-24). In fact, Plaintiff was instructed by Grayco that he was not to contact Cox and that any questions or issues should be directed to Grayco. (*Id.,* 146:11-15). The only time Plaintiff ever contacted Cox was if Grayco's computer system was down or if he needed Cox to turn on its cable service to a specific location so that he could determine if a cable box had been properly installed. (*Id,.* 166:7-15).

Plaintiff did not discuss his work for Grayco with anyone at Cox. (*Id.* 101:17-24). Indeed, Plaintiff could not recall the name of anyone – employee, supervisor, or otherwise – that worked at Cox. (Pl. Dep. 141:8-14; 243:20-22.) There was never a Cox supervisor present when Plaintiff was installing equipment in Cox's customers' homes. (*Id.* 117:6-118:15). To the extent Plaintiff ever crossed paths with a Cox employee in the customers' homes, any conversations between Plaintiff and these employees were limited to exchanging pleasantries. (*Id.* 118:4-14). Plaintiff recalls that Cox representatives were present at Grayco's office on "a few occasions" while Grayco was holding its weekly meeting, but admits that the meetings were conducted by Grayco supervisors. (*Id.* 136:23-137:4, 140:22-25). The Cox representatives said very few words to the technicians other than "keep up the work," "pep talk" type conversations. (*Id.*, 135:14-136:5). Plaintiff also recalls Cox representatives coming to the Grayco office on just two separate occasions to explain specifications for a new Cox product that Grayco would be installing. (*Id.*, 135:14-136:5). However, these Cox representatives did not teach Plaintiff how to do his job–they only provided Grayco's technicians with information about Cox's new product. (*Id.*, 136:7-10).

### 3.    *Cox Did Not Train Plaintiff On How To Perform His Job*

Plaintiff had prior training, skills, and experience as a cable installer before he worked for Grayco. (Pl. Dep. 64:2-5; 139:2-7). Specifically, he had a working understanding of electronics and knew how to transmit signals, and fix boxes and controls from his prior jobs as both a cable installer and marine service technician. (Pl. Dep. 60:17-21; 63:3-8). He did not receive any

9

training from Cox or Grayco. (Pl. Dep. 135:2-4; 138:20-139:7).

### E.   Cox Did Not Fire Plaintiff and Had No Authority to Do So

When Plaintiff resigned, he notified Grayco, not Cox. (Pl. Dep. 100:5-9). Cox did not know about Plaintiff's resignation, and had no reason to, as Cox is not involved in terminations at Grayco. (Williams Dep. 106:19–107:1; Williams Decl., ¶ 12; Peeples Decl. ¶¶ 23, 25). While Cox can advise Grayco that it does not want a certain technician performing installation work for its customers, Cox cannot tell Grayco to fire the technician. (Peeples Decl. ¶ 24).

### F.   Cox Did Not Maintain Employment Records For Plaintiff

Cox did not maintain employment records of any kind for Grayco's technicians, including Plaintiff. (Peeples Decl. ¶ 26). Plaintiff did not complete an application to work for Cox. (Pl. Dep. 92:3-5). Cox did not pay Plaintiff. (*Id.*, 182:10-12). Plaintiff did not receive performance reviews or reprimands from Cox. (*Id.*, 179:8-10). The only record Cox kept was the information contained on Plaintiff's badge (*e.g.*, name and technician number) that was issued to Grayco by Cox. (Peeples Decl. ¶ 26). Consistent with this information's <u>safety</u> purpose, badge information is kept by Cox's security group only. (Peeples Dep., 40:6-10).

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on June 13, 2016, alleging that Cox and Grayco failed to pay him overtime and deducted from his pay in violation of the Fair Labor Standards Act and La. Rev. Stat. §§ 23:631 and 23:632. (Dkt. 1). In response to Cox's Motion to Dismiss, the Court dismissed the claims under §§ 23:631 and 23:632, but held that Plaintiff had stated a deduction claim under § 23:635. The operative Complaint is the Third Amended Complaint (Dkt. 56), filed on November 18, 2016. The sole issue presented by this Motion is whether there is any evidence to support Plaintiff's claim that he was jointly employed by Grayco <u>and</u> Cox.

## ARGUMENT AND CITATION OF AUTHORITIES

### I.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a)(1) As the movant, Cox bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Martin v. Spring Break 83 Production, LLC*, 797 F. Supp.2d 719, 723 (E.D. La. 2011). The burden then shifts to Plaintiff to "produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Id.* at 723. In order to satisfy his burden, Plaintiff "must put forth competent evidence and cannot rely on 'unsubstantiated assertions' and 'conclusory allegations,'" as he has done in this case. *Id.* at 723. Because Plaintiff cannot set forth a shred of evidence to support his assertion that Cox is his employer, his Complaint against Cox should be dismissed as a matter of law.

## II.   COX IS NOT A JOINT EMPLOYER

### A.   Joint Employer Standard–Economic Realities Test

Although it is expansive, the FLSA is not unlimited; FLSA liability must be predicated upon the existence of an employer-employee relationship. 29 U.S.C. § 216(b). The Fifth Circuit uses an "economic reality test" to determine whether there is a joint employment relationship between a plaintiff and a defendant. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012).

"In joint employment contexts, *each* employer must meet the economic reality test." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (emphasis added). Under the economic reality test, courts consider whether each alleged employer "(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* "While each element need not be present in every case, finding employer status when none of the factors is present would make the test meaningless." *Gray*, 673 F.3d at 357.

The economic reality test is meant to ensure that the FLSA is not read too narrowly or too broadly. "When evaluating a putative joint employment relationship, courts must effectuate the broad scope of the FLSA, while not construing the statute so broadly as to subsume typical independent contractor relationships." *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689 (D. Md. 2010). "Therefore, the economic reality test is 'intended to expose outsourcing relationships

11

that lack a substantial economic purpose, but it is manifestly not intended to bring normal strategically oriented contracting schemes within the ambit of the FLSA." *Id.*

Cox and Grayco have just the kind of "normal strategically oriented contracting scheme" having a "substantial economic purpose" that does not fall within the ambit of the FLSA. Rather, the undisputed evidence shows that all four factors of the economic reality test weigh decidedly in favor of Cox. To allow Plaintiff to continue to pursue this litigation against Cox, notwithstanding his inability to show a genuine issue of material fact as to <u>any</u> factor would render the Fifth Circuit's economic reality test "meaningless."

**B.      Grayco Is an Independent, Viable Business Concern; It Is Not "Bogus," "Unfunded," or a "Figurehead"**

Plaintiff survived Cox's Motion to Dismiss on the basis of his allegation that Cox set up "bogus, unfunded or 'judgment proof' entities as 'independent contractors' in an attempt to circumvent the provisions of the FLSA" and that Cox actually controlled Plaintiff's employment, pay, hours, schedule, and all other terms and conditions of his employment. *See* 11/1/16 Order [Dkt. 41], adopting Order and Reasons in *Crosby v. Cox Comm'ns*, No. 16-6700 [Dkt. 34] p. 7 (the "*Crosby* Order"). But, now that discovery in this case has closed, the undisputed evidence conclusively disproves these allegations.

Contrary to Plaintiff's allegation, Grayco is a separate independent business that is in no way controlled by Cox. Grayco was founded in 1998 and operated independently for 15 years before it first began servicing Cox customers in 2014. (Grambow Decl.¶ 16). Grayco operates throughout Texas and Louisiana, and has a construction and security installation division in addition to its cable installation division. (*Id.* ¶¶ 2, 11). Even in its cable installation division, Grayco was not required to work exclusively for Cox, and actually has contracts with multiple other cable companies, including AT&T, Comcast, SuddenLink, and Charter. (Grambow Decl. ¶¶ 4, 13). As a result, Cox is hardly Grayco's only customer. (*Id.* ¶ 14). On the contrary, only approximately one-third of Grayco's annual revenue is attributable to Cox. (*Id.* ¶ 15). Cox has no financial interest in Grayco; it does have any control over Grayco's technicians' expenses, or

provide Grayco (or its technicians) with any tools. (Grambow Decl. ¶ 7; Peeples Decl. ¶ 22; Williams Dep. 67:6-11). Rather, Grayco is responsible for ensuring that it (or its technicians) have everything they need to perform their work. (William Decl. ¶ 6). These undisputed facts establish that Grayco is certainly not a "figurehead" or "sham" as alleged by Plaintiff.

Even if Plaintiff's allegations of Grayco's economic dependence on Cox were true, and they are clearly not, this is not dispositive of joint employer status. *See, e.g., Zampos v. W&E Communications, Inc.*, 970 F. Supp. 2d 794, 805 (N.D. Ill. 2013) ("W&E's apparent dependence on Comcast simply does not translate into functional control by Comcast over W&E technicians.").[10] For example, in *Jacobson*, the court noted that while the "Installation Companies work primarily, if not exclusively for Comcast, a single client base is not a proxy for joint employment because it is 'perfectly consistent with a legitimate subcontracting relationship.'" 740 F. Supp. 2d at 693. Moreover, "where a subcontractor performs merely a majority of its work for a single customer, there is no sound basis on which to infer that the customer has assumed the prerogatives of an employer."[11]

In sum, even if it were true that Grayco was economically dependent upon Cox as its sole customer–and the undisputed evidence establishes otherwise–this fact would not transform Cox into a joint employer as a matter of economic reality. Rather, as illuminated through application of the Fifth Circuit's four-factor "economic reality" test, Grayco is a viable, independent business entity that made its own decisions about whether to contract with or hire Plaintiff, how much to pay him, and how to set all terms and conditions of its relationship with Plaintiff.

C.      **The Undisputed Evidence Shows that All Four Factors of the Fifth Circuit's Economic Reality Test Weigh *Against* Joint Employment**

Courts applying the economic reality test in the Fifth Circuit to determine whether an entity is a joint employer look to four factors: (1) the power to hire and fire; (2) supervision or

---

[10] *See also Thornton v. Charter Communications, LLC*, No. 4:12CV479SNLJ, 2014 WL 4794320 (E.D. Mo. Sept. 25, 2014) (granting summary judgment on joint employment even though Charter was installer's only customer).

[11] citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d Cir. 2003); *see also Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1156, 1160 (C.D. Cal. 2003) (no joint employer relationship where one customer was contractor's primary source of income); *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1327-28 (S.D. Fla. 2001) (no joint employment even where installation company worked permanently and exclusively for one cable company).

control over work schedules or conditions of employment; (3) determination of the rate or method of payment; and (4) maintenance of employment records. *See Orozco*, 757 F.3d at 448. Because the undisputed evidence shows that none of these factors weighs in favor of joint employment in this case, Cox requests that this Court dismiss it from this action.

### 1.    *Cox Did Not Possess the Power to Hire or Fire*

Plaintiff admits that Cox did not hire him, and it is undisputed that Cox did not have the power to hire or fire Grayco's technicians. (Pl. Dep., 100:2-7; Williams Dep. 106:19–107:1; Williams Decl., ¶ 12). The undisputed evidence shows that Plaintiff applied to work for Grayco, not Cox. (*Id*., 82:2-14; 91:23-92:21). He did not speak to anyone from Cox about a job before or during the hiring process. (*Id.,* 92:21). Grayco hires its technicians without Cox's input. (Williams Dep., 106:11-14). When Plaintiff was hired, he understood that he was a subcontractor for Grayco, not Cox. (Pl. Dep., 92:23–93:2). Cox does not interfere or direct Grayco with regard to its hiring or firing decisions. (Williams Dep., 106:11-22; Williams Decl., ¶ 12). Indeed, Cox had no knowledge that Plaintiff had resigned because Plaintiff only told Grayco that he was quitting, not Cox. (Pl. Dep., 100:5-9; Peeples Decl., ¶ 25).

Similarly, in *Jean-Louis v. Metropolitan Cable Communications, Inc.*, which involved joint employer claims against Time Warner, the plaintiff cable technicians submitted employment applications to, interviewed with, and were told they were hired by the vendor installation company, not Time Warner. 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011). Given those facts–which are the same as exist here–the *Jean-Louis* court granted summary judgment to the cable company on joint employment grounds. The same result should occur in this case.

The fact that Cox required Grayco's technicians to pass background checks for the safety of its customers before being authorized to do installations for Cox's customers does not establish the power to hire and fire. As one court held, that a cable company "had to pre-approve the hire of every [contractor] technician" does not show the power to hire and fire because such "pre-approval was . . . to ensure safety and quality service." *Thornton*, 2014 WL 4794320, *14. Similarly, in *Jacobson*, the court found that Comcast's right to approve all new hires, who had to

14

pass a background check, did not cause this factor to weigh against Comcast in the joint employer analysis when Comcast only exercised such power in the context of quality control. 740 F. Supp. 2d at 686-87.

The facts here are even more favorable to Cox because if a technician fails a background check or drug screen, Grayco indisputably is free to hire or retain that technician in some other capacity, such as working for Grayco's other customers, in Grayco's warehouse, or in one of Grayco's other divisions. (Williams Dep. 106:15-18, 108:17-23; Williams Decl. ¶ 13). Accordingly, Cox's requirement that Grayco's technicians undergo background checks does not equate to the right to hire the technicians.

Additionally, that Cox could have deleted Plaintiff's technician number from Cox's system does not mean that Cox could fire Plaintiff from Grayco. Specifically, the court in *Jean-Louis* found that the "limited power" to "de-authorize a technician" was not the same as preventing the technician from working for the contractor altogether, and, therefore, was not the same as the "right to fire." 838 F. Supp. 2d at 124-25. In its holding, the *Jean-Louis* court relied on *Jacobson* to reject the plaintiff's argument that a de-authorization right gave Time Warner the *de facto* power to fire–even when Time Warner was the sole source of the contractor's revenue.

Here, any argument by Plaintiff that Cox had the "*de facto*" power to fire him because it could have prevented him from doing installations for Cox's customers would not hold water even if Cox were Grayco's only customer *See id.* But Grayco has multiple customers besides Cox. As a result, a technician who can no longer work for Cox can still work for Grayco in another capacity. (Williams Dep., 108:17-23; Williams Decl. ¶ 13). Thus, Cox does not have the right to fire Grayco's technicians, and this factor clearly weighs in favor of a finding that Cox was not Plaintiff's joint employer.

### 2.    *Cox Did Not Supervise Plaintiff or Control His Work Schedule or Conditions of Employment*

The second factor of the economic reality test – supervision and control of employee schedules and conditions of employment – likewise weighs against finding Cox to be a joint

employer. Cox had nothing to do with Plaintiff's work schedules or conditions of employment.

### i.       Cox Did Not Control Plaintiff's Work Schedule

Cox received customer requests for services during a two-hour time window and created work orders based upon these requests. (Peeples Decl., ¶ 10). Grayco submitted a list of resources (*e.g.*, 15 technician numbers) available each day to complete these work orders. (Williams Dep. 53:12-16; 55:2-7; 64:11-15; Peeples Decl. ¶ 14). Cox's computer system then bundled batches of work orders in the geographic areas in which Grayco had resources, and sent those bundles to Grayco. (Peeples Decl., ¶ 13). Grayco then assigned specific work orders to specific technicians as Grayco saw fit. (Williams Dep. 54:1-6; 14-18; 82:12-13). Cox does not learn which technician number is assigned to a work order until the work order is completed by Grayco, closed out, and recorded in ICOMs. (Peeples Dep., 116:23–117:8).

In *Valdez v. Cox Communications Las Vegas, Inc.*, the court found that sending work orders to a third party contractor is not exercising control over the schedules of the technicians that the contractor had hired to perform the actual work. 2012 WL 1203726, *2 (D. Nev. Apr. 11, 2012). This scheduling process is also nearly identical to that in *Jean-Louis*, wherein Time Warner received customer service requests, created work orders based on those requests, and bulk-routed the work orders to its contractor, which assigned the work to its technicians as it deemed appropriate. 838 F. Supp. 2d at 125-26 (holding that routing work orders to a contractor <u>does</u> <u>not</u> evidence control over technician work schedules).

Any argument by Plaintiff that Cox controls the technicians' schedules because the work orders fall within certain "time windows" fails; Cox's ***customers*** select their preferred service times. Indeed, the court in *Jean-Louis* rejected this very argument and held that Time Warner's ***customers'*** requests for service in specific time windows was not evidence that Time Warner controlled the technician's schedules. 838 F. Supp. 2d at 126. Therefore, in accordance with the holdings in *Jean-Louis* and *Valdez*, Cox's system of routing work orders to Grayco, who then assigns them to technicians, cannot be argued to constitute control over Plaintiff's schedule.

ii.     **Cox Did Not Supervise Plaintiff**

Plaintiff testified that he was supervised by Grayco supervisor, Louis Hall, not Cox. (Pl. Dep., 120:4-11). Plaintiff checked in with Hall, not Cox, when he came into work, when he needed to leave work early, or when he was sick. (*Id*. 166:17–167:11). If Plaintiff had a question on an installation, he contacted Grayco, not Cox. (*Id.* 118:22-25; 164:6-25; 121:20-24). In fact, Grayco told its technicians, including Plaintiff, that they were <u>not</u> to contact Cox if they had issues. (*Id.* 146:11-15). The only time Plaintiff contacted Cox directly (in contravention of Grayco's instructions) was when Grayco was unable to contact Cox due to technical problems, or when Plaintiff needed Cox dispatch to turn on a cable box so that he could test functionality. (*Id.* 166:7-15). While Plaintiff occasionally saw Cox employees at customers' homes, none of these employees supervised him, assisted him, or gave him instructions. (*Id.* 117:14-118:11). No one from Cox told Plaintiff how to do his job, and Cox did not provide Plaintiff any policies or procedures telling him how to perform his job. (*Id.* 243:11-244:1; 246:6-9).

Cox did not provide any training to Plaintiff. (*Id.*, 135:2-4; 138:24-139:7). Plaintiff recalls seeing Cox representatives just a few times during his four months of work at Grayco, in the context of Grayco's regular meetings, and <u>twice</u> when Cox gave information about a new product to Grayco. (*Id.* 135:14-136:5). During Grayco's meetings, Plaintiff admits that the Cox representatives only exchanged pleasantries. (*Id.*, 140:7-11; 135:14-136:5). During the new product meetings, Plaintiff agreed that Cox was not telling him how to do his job by simply providing information regarding a new product or its specifications. (*Id.*, 136:7-10). In *Gray*, the Fifth Circuit held that telling the plaintiff that he was doing a "good job" and twice asking him to serve specific individuals was "too paltry" to support an inference of "supervision." 673 F.3d at 356-57. There is no genuine issue of material fact that Cox did not supervise Plaintiff.

iii.    **Cox's Quality Control And Safety Measures Do Not Establish Joint Employment**

Unable to show any indicia of control over his schedule or work environment, Plaintiff is likely to rely on various measures taken by Cox to ensure that work done by Grayco for Cox's

customers is done correctly (*i.e.*, quality control) and safely. Quality control measures include Cox's Field Services Agreement, which incorporates a technical specifications manual, and Cox's random quality control checks of completed work orders. (Ex. E).

But any measure taken by Cox to ensure safety and quality control is <u>not</u> the kind of "control" that is indicative of a joint employment relationship, as numerous courts have found. *See, e.g., Jacobson*, 740 F. Supp. 2d at 690 ("The nature of the control exercised by putative joint employer[s] is the key element in this analysis. This factor does not contemplate the generic control exercised by a supervisor over an independent contractor."). As one district court explained, citing to no fewer than <u>four</u> other cable cases:

> Plaintiffs emphasize the quality control measures that Charter [the cable company] undertook as an indication of employment. Plaintiffs' argument, however, "ignores the differences between affecting and supervising and controlling." *Jean-Louis*, 838 F. Supp. 2d at 126. Further, "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.* It is well-established that measures such as tracking on-time arrivals, requiring Mainline [the installation company] to ensure quality performance and service, assistance with billing and activation for Charter customers, and requiring that Mainline technicians follow Charter technical specifications when installing Charter equipment are typical in a contractor relationship and do not establish joint employment. As set forth above, the district courts in *Zampos*, *Valdez*, *Lawrence*, and *Jacobson* all found that this type of quality control and compliance monitoring stem from the nature of the cable provider business and the need to provide reliable service to customers, not the nature of the relationship between the technicians and the cable provider, and do not establish joint employment by the cable provider.

*Thornton*, 2014 WL 4794320, *15; *Jacobson*, 740 F.Supp.2d at 690 ("[D]etailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship.").

Similarly, the fact that Grayco's technicians were required to identify themselves as Cox-authorized vendors for safety reasons does not transform Cox into their employer. As the district court found in *Herman*, requiring cable installers to wear uniforms, undergo a background check, attach signs to their vehicles identifying the cable company, and wear ID badges does not render the cable company a joint employer. *Herman*, 164 F. Supp. 2d at 670; *see also Smilie v. Comcast Corp.*, No. 07-CV-3231, 2009 WL 913980, at *3 (N.D. Ill. Feb. 25, 2009) (requiring the

18

contractor's technicians to wear certain clothing, including a shirt identifying the technician as a "contractor" for the cable company does not show that the cable company controlled the contractor's technician) (citing *Santelices*, 147 F. Supp. 2d at 1327 (granting summary judgment to cable company on the issue of joint employment even where the contract required the contractor's technicians to be neatly dressed and polite)).

In short, Cox did not have the kind of day-to-day, supervisory control over Grayco's technicians that would justify finding joint employment. Cox's retention of **quality** control is consistent with its FSA and legitimate subcontracting relationships. Accordingly, the second factor weighs in favor of a finding that Cox was not Plaintiff's joint employer.

### 3.    *Cox Did Not Determine Plaintiff's Rate or Method of Payment*

Cox did not set the amount or method of Plaintiff's pay, deduct any amounts from Plaintiff's pay, or issue Plaintiff's paychecks or Form 1099. (Pl. Dep., 227:1-3; 133:22-25; 182:6-12; Williams Dep., 109:15-110:4). Rather, Plaintiff received his paychecks and 1099 from Grayco, and will identify Grayco as the source of his income on his tax returns. (Pl. Dep., 182:6-12; 99:14-20; 130:20-22). Cox had no involvement in how or how much Grayco paid its technicians, other than to require that Grayco comply with wage and hour laws. (Peeples Dep., 185:16-20; Peeples Decl., ¶¶ 19, 20). Grayco decided how to pay, how much to pay, and whether and how much to charge back its technicians. (Williams Decl. ¶ 9; Williams Dep. 109:6-110:4).

Cox's payments to Grayco pursuant to the FSA, while leaving technician compensation entirely up to Grayco, does not indicate joint employment. *See Valdez*, 2012 WL 1203726 at *4. As one court noted, "what [the cable company] paid [the installation company] for a given job no more determines what [the installation company] pays technicians…than customers who buy a given product determine how the companies who produce the product pay the employees who actually make it." *Jean-Louis*, 838 F. Supp. 2d at 129 (finding that the installation company, not the cable company, determined the rate and method of payment); *see also Zampos v. W&E Communications, Inc.*, 970 F. Supp. 2d 794, at 804 (N.D. Ill. 2013) (Comcast does not control technician pay through payments to installation company). Similarly, in *Jacobson*, Comcast had

a contract pursuant to which it paid its contractor on a per-service basis, but did not issue its contractor's technicians' (the plaintiffs') checks, pay stubs or W-2s. 740 F. Supp. 2d at 692. The court found that the mere fact that the cable company paid its contractors on a per-service basis, and the contractors, in turn, paid their technicians on a per-service basis, was insufficient to show that Comcast controlled the rate and method of payment of its contractors' technicians. *Id.*

Similarly, that Cox deducted from its payments to Grayco for failed quality control inspections pursuant to the FSA does not indicate joint employment. Grayco (not Cox) decided whether, when, and how much (if anything) to deduct from Plaintiff's paychecks. (Williams Dep., 109:18-110:4). Cox never instructed Grayco to deduct anything from its technicians' pay. (Peeples Dep. 185:11-24; Peeples Decl., ¶ 21). Of significance is Grayco's manager's testimony that if Cox deducted from its payments to Grayco for failed quality control inspections, Grayco did not always pass that deduction along to its technicians, and if it did, Grayco decided whether to pass along the entire deduction or only a portion of it. (Williams Dep. 50:1-51:6; 109:25-110:4). In sum, the undisputed evidence shows that Cox paid Grayco pursuant to the FSA, and then Grayco (not Cox) determined the rate and method of Plaintiff's pay, including whether Plaintiff was charged back. Accordingly, this factor weighs against Cox being a joint employer.

### 4.    *Cox Did Not Maintain Employment Records for Plaintiff*

Cox does not have and has never had any employment records for Plaintiff or any of Grayco's technicians. (Peeples Decl., ¶ 26). Plaintiff admits that he submitted his application and subcontractor agreement to Grayco, not Cox. (Pl. Dep., 92:18-93:2). Plaintiff admits that he did not enter into any sort of contractual relationship with Cox and did not provide Cox any documents, nor did Cox provide him documents. (*Id.*, 245:1-25).

The only thing Plaintiff received from Cox was his technician number and employment badge, which Grayco provided him. (*Id.*, 246:17-21). The only information that Cox maintains regarding Grayco's technicians is the information relevant to each technician's identification badge. (Peeples Decl., ¶ 26). Even then, the technician's name is only maintained for security purposes by Cox's security department. (Peeples Dep., 42:16-18). As the court in *Valdez* held,

identification information "gathered as part of the badging process" is not sufficient to show that Cox maintained Plaintiff's employment records. 2012 WL 1203726 at *4.

In short, the undisputed evidence shows that Cox does not maintain any employment records for Grayco's technicians. Accordingly, this factor, just like all the other factors in the economic realities test, weighs against a finding that Plaintiff was jointly employed by Grayco and Cox. Because all four of the factors under the economic reality test weigh in favor of a finding that Cox is not Plaintiff's joint employer under the FLSA, Cox is entitled to judgment as a matter of law and respectfully requests that it be dismissed from this action.

### D.    None of the Independent Contractor Factors Supports Joint Employment

As the Court indicated in ruling on Cox's Motion to Dismiss, courts in the Fifth Circuit have analyzed various factors in determining whether an employment relationship exists as a matter of economic reality. The foregoing four-factor test is the Fifth Circuit test to be applied in cases of joint employment. *See Orozco*, 757 F.3d at 448. However, two district courts in Louisiana have applied a version of the economic reality test designed to examine independent contractor status to the joint employment context.[12] Although this "independent contractor" test is "ill-suited" to determining joint employment issues because it focuses on who is an <u>employee</u> rather than who is an <u>employer</u>, these factors are addressed herein out of an abundance of caution.[13] Regardless, none of these additional factors (to the extent they apply) supports Plaintiff's claim of joint employment against Cox.

---

[12] *See Carnero v. Patterson Structural Moving & Shoring, LLC*, No. 14-2064, 2015 WL 225362 (E.D. La. Jan. 15, 2015) (applying factors set forth in *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 327 (5th Cir. 1993)); *Altier v. Worley Catastrophe Response, LLC*, No. 11-241, 2011 WL 1791292 (E.D. La. May 9, 2011) (same).

[13] It is this distinction that explains why Judge Vance in *Lang v. DirecTV* applied the independent contractor, rather than the joint employment, factors. 801 F. Supp. 2d 532. In that case, DirecTV chose not to argue the joint employment issue at summary judgment, focusing entirely on whether the technician was an employee or independent contractor ***of the installation company***. *Id.* at 535 ("Defendants ask the Court to limit its inquiry to the relationship between plaintiffs and Modern Day and ***not to consider whether defendants are joint employers***.") (emphasis added). Judge Vance declined defendants' invitation because to do so would effectively be to assume that no joint employment exists, which the Court could not do on summary judgment. *Id.* at 535-36. Accordingly, the *Lang* court assumed joint employment existed and then analyzed "the working relationship between each plaintiff and all three defendants as 'one employment.'" *Id.* at 536.

### 1.      *Plaintiff Brought His Own Skills And Initiative to the Job*

Cable installation is a technical field requiring specific skills and training. (Peeples Decl., ¶ 5); *see also Santelices*, 147 F. Supp. 2d at 1319-20 ("A cable installer in today's market is considered a skilled tradesman."); *Herman*, 164 F. Supp. 2d at 672-73 (declining to find cable company was joint employer, in part, because installation technicians were skilled tradesmen). Plaintiff had prior training, skills and experience in cable installation. (64:2-5; 139:2-7). Similarly, Plaintiff had initiative as to how he did his installation work–no one from Cox told him how to get the job done. (Pl. Dep., 120:4-5; 243:11-18). Even given the limited utility of this factor, it still weighs in favor of a finding that Cox was not Plaintiff's joint employer.

### 2.      *Plaintiff Did Not Have a "Permanent" Relationship with Cox*

The "permanency of the relationship" between Plaintiff and Cox is ill-suited to determine whether Cox was Plaintiff's joint employer because it presumes the existence of a relationship directly between Plaintiff and Cox that could be measured for "permanence." But Plaintiff testified that he did not have any contractual relationship with Cox, just a subcontractor agreement with Grayco. (Pl. Dep., 92:23-93:2; 245:21-25). Cox did not have any input with regard to Grayco's relationship with its contractors, including how long it chose to retain its technicians and whether its technicians serviced other customers. (Williams Decl. ¶ 14). Thus, this factor sheds little light on whether Cox was a joint employer of Plaintiff. Nevertheless, it is worth nothing that Plaintiff worked for Grayco for less than four months. (Pl. depo. 53:14-16).

### 3.      *Plaintiff's Work Was Not Performed on Cox's Premises*

Plaintiff reported to Grayco's office every morning before leaving to do jobs in customers' homes. (Pl. Dep., 104:20-23; 105:21-24; 106:1-8). Plaintiff was never required to go to Cox's premises as part of his regular job duties. (*Id.*, 146:17-23). This is not a case like *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), in which the plaintiffs reported to one place every day and worked side-by-side with employees; Plaintiff reported, if anywhere, to Grayco. This shows that Cox was not Plaintiff's joint employer. *See Wirtz*, 405 F.2d at 669.

### 4. *Plaintiff Was Free to Turn Down Cox Work*

Whether Plaintiff turned down a work order that Grayco assigned to him was a matter between Grayco and Plaintiff because Grayco could assign the work to any technician it chose if Plaintiff declined, so long as the requirements in the FSA are met. (Peeples Dep. 39:6-15).

In sum, under the economic reality test for joint employment, as well as any other factor the Court may consider, the undisputed facts show that Cox was not Plaintiff's joint employer. Thus, summary judgment should be granted as to Cox.

### III. COX IS NOT PLAINTIFF'S EMPLOYER AND DID NOT DEDUCT FROM HIS PAY UNDER LA. REV. STAT. § 23:635

Plaintiff has never expressly pled a claim under La. Rev. State § 23.635, raising this claim only in response to Cox's Motion to Dismiss his expressly-pled claims under La. Rev. Stat. §§ 23:631 and 23:632. Plaintiff survived dismissal based on conclusory allegations that Grayco was a mere figurehead, and that Cox actually controlled Plaintiff's employment, pay, hours, schedules, and conduct. (*See Crosby* Order, p. 13). As an initial matter, this allegation is contradicted by the undisputed evidence showing that Grayco is an independent, viable business with numerous customers other than Cox. Further, Plaintiff's claim under § 23:635 fails because Cox is neither Plaintiff's employer nor did Cox ever make any deduction from Plaintiff's pay.

Section 635 provides that "[n]o person, acting either for himself or as agent or otherwise, shall assess any fines against ***his employees*** or deduct any sum as fines from their wages." (emphasis added). By its express terms, § 23:635 applies only to an <u>employer</u> who assesses a fine against "his employees". This provision "must be strictly construed" and not "extend beyond the clear wording of the statute."[14] Courts consider the totality of the circumstances when examining the undefined term "employment" in the context of the Penalty Wage statute.[15] The principal, though not exclusive factor in this analysis is "control over the work."[16] Thus, for the same reasons that Plaintiff cannot establish that Cox was his joint employer for FLSA purposes, the

---

[14] *Knapp v. The Mgmt. Co.*, 476 So.2d 567, 569 (La. App. 3d Cir. 1985); *see also Slaughter v. Bd. of Superiors*, 76 So. 3d 438, 456 (La. App. 1st Cir. 2011) (court must strictly construe § 23:635).
[15] *See Mendoza v. Essential Quality Constr., Inc.*, 691 F. Supp. 2d 680 (E.D. La. 2010).
[16] *Hulbert v. Democratic State Cent. Comm. of Louisiana*, 68 So. 3d 667, 670-71 (La. App. 1st Cir. 2011).

undisputed evidence also establishes that Cox did not have "sufficient control over the plaintiffs to justify recognition as their employer under Louisiana law." (*Crosby* Order, p. 13).

Moreover, Plaintiff admits that any deductions from Plaintiff's paychecks were made by Grayco, not Cox. (Pl. Dep., 131:2-6; 133:22-25; 134:4-6). Plaintiff cannot argue that Grayco merely "passed through" deductions that Cox made from amounts owed to Grayco under the FSA because that did not happen; Grayco alone made the decision whether, when, and how much to deduct from its technicians wages. (Williams Dep., 109:18-110:4). Because Plaintiff was not an employee of Cox and Cox did not, directly or indirectly, make any deduction from Plaintiff's pay, summary judgment in favor of Cox is appropriate under Section 23:635.

## IV.   CABLE COMPANIES ARE NOT LIABLE AS JOINT EMPLOYERS WITH THEIR INSTALLATION CONTRACTORS

United States District Court Judge Philip Pro, who granted Cox's Motion For Summary Judgment in *Valdez v. Cox Communications Las Vegas, Inc., et al.*, held: "[a]lthough the details are sometimes different, every court to address this issue ultimately has found no joint employment for cable installers at the summary judgment stage under factual circumstances fairly similar to those before this Court." 2012 WL 1203726 at *6 (citing *Jean-Louis*, *Jacobson*, *Simile*, and *Santelices*).[17] Since Judge Pro's decision recognizing that every court in the country granted summary judgment to cable companies on the issue of joint employment, there has been but one exception, the facts of which are wholly distinguishable to this case and all the others.[18]

---

[17] *See Thornton*, 2014 WL 4794320, at *33 (holding that "plaintiffs were not Charter employees under the FLSA" and granting summary judgment on the issue of joint employment); *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667 (D. Md. 2000) (finding cable company was not joint employer of independent contractor installers); *see also Zampos*, 970 F. Supp. 2d at 806 ("Accordingly, the Court holds that Comcast is not Plaintiffs' joint-employer within the meaning of the FLSA [or] their state-law, wage claims."); *Jean-Louis*, 838 F. Supp. 2d at 136-38 ("Nevertheless, the undisputed facts show that almost every factor weighs against finding that Time Warner jointly employed Metro technicians"); *Jacobson*, 740 F. Supp. 2d at 693-94 ("I conclude that Comcast is not Plaintiff's joint employer within the meaning of the FLSA."); *Lawrence*, 2011 WL 666304 at *34 ("I conclude that Cablevision is not the joint employer of plaintiff or Adderley's other technicians within the meaning of both the FLSA and the New York Labor Law"); *Smilie*, 2009 WL 9139890 at *12 ("In sum, Comcast did not supervise Plaintiffs' day-to-day activities or control their working conditions. Accordingly, Comcast was not a joint employer of Plaintiffs"); *Rodriguez*, 2011 WL 6738850 at *19 ("The record in this case is very similar to those in [*Jacobson*] and [*Lawrence*], and here also the cable provider is entitled to summary judgment").

[18] As noted above, the only cable case to have found a joint employment relationship is *Perez v. Lantern Light*, 2015 WL 3451268, which involved DirecTV. *Perez* was based on totally different facts, including: (1) DirecTV forbade technicians from working for competitors; (2) DirecTV collected individual technician performance data and imposed discipline on underperforming technicians; (3) DirecTV assigned work orders to technicians based on skill

Indeed, the facts in this case are in line (and even stronger in some respects) with all of the other decisions granting summary judgment to cable companies on the issue of joint employment, particularly those in *Jacobson*, *Jean-Louis*, and *Valdez*. In each case, courts found that the following factors demonstrated that the cable company was not a joint employer: the cable company did not hire, fire, supervise or train the contractor's technicians; the cable company only required, for safety and quality control purposes, that the technicians pass a criminal background check and wear a badge or a uniform identifying them as an authorized contractor; the cable company did not issue paychecks or IRS forms to the technicians; the cable company only provided cable equipment rather than tools to the contractor's technicians; the cable company bulk-routed batches of work orders to the contractor, who then assigned the work orders to its technicians as it saw fit; and the cable company paid or charged back the contractor, rather than the individual technicians.[19] Each of these factors is present in this case. Accordingly, Cox requests that this Court join the majority of courts and find that Cox is entitled to judgment as a matter of law on the issue of joint employment.

## <u>CONCLUSION</u>

Cox respectfully requests that the Court grant its Motion for Summary Judgment in its entirety, dismiss Cox from this lawsuit, and award Cox its reasonable attorneys' fees and costs.

Respectfully submitted this 1st day of March, 2017.

**CHAMBERLAIN HRDLICKA**
**WHITE WILLIAMS & AUGHTRY**

By:   *s/ Annette A. Idalski*
Annette A. Idalski, T.A. (*Pro Hac Vice*)
Annette.idalski@chamberlainlaw.com
Peter N. Hall (*Pro Hac Vice*)
Peter.hall@chamberlainlaw.com
191 Peachtree Street, N.E., 46th floor

---

set, work schedule, and location; (4) DirecTV required technicians to work 10-hour shifts; (5) DirecTV denied leave requests from technicians; (6) DirecTV maintained a database of technician names, contact information, skill set, weekly schedules, and certification status; and (7) technicians moved between multiple installation companies while maintaining their same relationships with DirecTV. Not one of these facts is present in this case.

[19] *Jacobson*, 740 F. Supp. 2d at 686-87; *Jean-Louis*, 838 F. Supp.2d at 116 -19; *Valdez*, 2012 WL 1203726 at *2-6.

Atlanta, GA  30303-1747
Telephone: (404) 658-5386 Fax: (404) 658-5387

**GORDON, ARATA, MONTGOMERY,**
   **BARNETT, MCCOLLAM, DUPLANTIS &**
   **EAGAN, LLC**

By:  s/ Donna Phillips Currault
Martin E. Landrieu (#18995)
Email:  mlandrieu@gordonarata.com
Donna Phillips Currault (#19533)
Email:  dcurrault@gordonarata.com
Phillip J. Antis, Jr. (#29067)
Email:   pantis@gordonarata.com
201 St. Charles Avenue   40th Floor
New Orleans, LA 70170-4000
Telephone:  (504) 582-1111  Fax: (504) 582-1121

26

## <u>CERTIFICATE</u>

I certify that I have served a copy of the above and foregoing Memorandum of Law in Support of Motion for Summary Judgment filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system, or by placing signed copies in the United States mail, postage prepaid, to counsel of record not participating in the CM/ECF system on this 1st day of March, 2017.

By: <u>*s/ Annette A. Idalski*   </u>
    Annette A. Idalski, T.A.